HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PETER GIROUX,<br><br>            Plaintiff,<br><br>      v.<br><br>KEYPORT, LLC, A/K/A KEYPORT FOODS, LLC, a Washington limited liability company,<br><br>            Defendant. | CASE NO. C09-481RAJ<br><br>ORDER |

## I.  INTRODUCTION

This matter comes before the court on a motion for summary judgment (Dkt. # 90) filed by Defendant Keyport, LLC ("Keyport") on Plaintiff Peter Giroux' claim for breach of contract.  Neither party requested oral argument, and the court finds this motion suitable for disposition based solely on the parties' briefing and supporting evidence.  For the reasons stated below, the court GRANTS Keyport's motion.

## II.  BACKGROUND

As of January 2007, Mr. Giroux had worked for 25 years as a fisherman and crab technician.  Giroux Decl. (Dkt. # 29) ¶¶ 2, 4.  During crab season, he worked aboard crab fishing vessels "maintain[ing] crab processing equipment and [overseeing] crab processing so as to maximize the amount of marketable crab."  *Id.* ¶ 4.  In January 2007, while working aboard the F/V NIKOLSKIY in the Barents Sea, he slipped and fell down

ORDER – 1

a staircase and suffered severe injuries. He brought suit against Defendants Keyport, Kangamiut Seafood A/S ("Kangamiut"), and Hermitage International, Ltd. ("Hermitage") to recover for those injuries under the Jones Act and federal maritime law, to obtain maintenance and cure payments, and to redress Defendants' breach of a contract to provide Mr. Giroux with financial support in the aftermath of the accident. Mr. Giroux, a Florida resident, alleges that he worked aboard the NIKOLSKIY in the service of a joint venture between Kangamiut, Keyport, and Hermitage.

Each of the three Defendants filed a motion to dismiss. In a December 2009 order (Dkt. # 82), the court granted Kangamiut's and Hermitage's motions and terminated them as parties in the lawsuit. Keyport remains as the sole Defendant, and now brings a motion for summary judgment on Mr. Giroux' breach of contract claim.

Mr. Giroux' breach of contract claim stems from an alleged meeting between him, Keyport representatives, and Kangamiut representatives in Florida in November 2008. Keyport's involvement stems from Mr. Giroux' belief that a meeting would be unsuccessful unless Keyport was present. *See* Giroux Decl. (Dkt. # 93) ¶ 8. From the evidence provided to the court, it appears that the planning for the meeting began in early September 2008. On September 5, Annette Mortensen (assistant to the managing director of Kangamiut) emailed Mr. Giroux and proposed that Kangamiut representatives "come over and sit down" with him to clarify the issues stemming from the case. *See* Giroux Decl. Exh. D (Dkt. # 93). Ms. Mortensen later reiterated that the purpose of the visit was to "explain directly to [Mr. Giroux] the legal and insurance status of the situation – **nothing else**." *Id.* (emphasis in original). Mr. Giroux claims that he was desperate for the meeting to happen due to his deteriorating financial situation, and that he was required to sign two documents in order for Keyport's representatives to attend the meeting. *See* Giroux Decl. (Dkt # 93) ¶¶ 2-3, 9-11. The documents included a "Hold Harmless Agreement" and a disclosure letter, both of which were drafted by Keyport's counsel, Chris Nicoll.

ORDER – 2

The Hold Harmless Agreement that Mr. Giroux signed contained a promise not to sue Keyport for any claim arising from injuries he suffered while working for any of several specified Russian vessels, including the NIKOLSKIY.  In return, Mr. Giroux was to receive the "assistance and support of Keyport LLC . . . and [Mr. Nicoll], in traveling to Jacksonville, Florida to meet with me and [Kangamiut] to help negotiate to a compromise my claims against Kangamiut."  *See* Pedersen Decl. Exh. 1 (Dkt # 91-2). Mr. Nicoll wrote the disclosure letter.  Dated October 10, 2008, it noted that "[a] meeting has been scheduled between Kangamiut, Peter Giroux and Keyport to attempt to determine if it is possible to reach a compromise without litigation."  *See* Pedersen Decl. Exh. 2 (Dkt # 91-2).  In the letter, Mr. Nicoll stated that "[he is] the attorney for Keyport LLC and not for anyone else" and that his role at the meeting would be "to help mediate a compromise between Kangamiut and Mr. Giroux."  *Id.*

Mr. Pedersen emailed Mr. Giroux and agreed to "try to get [the Florida meeting] moving" as soon as Mr. Giroux provided the signed documents.  *See* Giroux Decl. Exh. A (Dkt. # 93-2).  Mr. Pedersen also reassured Mr. Giroux that Keyport would "willingly contribute [its] best efforts to assist [Mr. Giroux] in a solution to resolve [his] issues with Kangamiut and Hermitage."  *Id.*  When Mr. Giroux completed his review and signature of the documents, he emailed them back to Mr. Pedersen along with a request to "go get'em and save my Family and House and cars and Credit and everything I've ever worked for."  *See* Giroux Decl. Exh. C (Dkt. # 93-2).  After Keyport received the signed documents, "everyone involved with the crab venture was invited to [meet] in Jacksonville."  Giroux Decl. (Dkt. # 93) ¶ 14.

The Florida meeting took place on November 6, 2008.  The evidence concerning the meeting is scanty.  At the beginning of the meeting, all of the parties assembled together, including Mr. Giroux, his wife Karen, Pete Lafser (a close friend of Mr. Giroux), Niels Rasmussen (Kangamiut's CEO), Lars Espersen (Kangamiut's attorney), Mr. Pedersen, and Mr. Nicoll.  *See* Giroux Decl. (Dkt. # 93) ¶ 18; Nicoll Decl. (Dkt. #

ORDER – 3

96) ¶ 3. According to Mr. Giroux, Mr. Pedersen and Mr. Nicoll acted as the go-betweens and met with each side separately for discussions. Giroux Decl. (Dkt. # 93) ¶ 18. Mr. Nicoll confirms this arrangement. *See* Nicoll Decl. (Dkt. # 96) ¶ 3.

By mid-afternoon the parties had not yet reached an agreement, and Mr. Giroux left for a short time to pick up his son from school. Giroux Decl. (Dkt. # 93) ¶ 21. He claims that when he returned, "the $10,000/24 months offer was made." *Id.* ¶ 22. This statement refers to an agreement to pay Mr. Giroux 24 monthly payments of $10,000 each (hereinafter "verbal agreement"). Mr. Nicoll states that Mr. Rasmussen formulated the proposal. *See* Nicoll Decl. (Dkt. # 96) ¶ 3. He also states that he heard Mr. Rasmussen make the proposal to Mr. Giroux and heard Mr. Giroux accept. *See id.* Mr. Nicoll volunteered to create a "memorandum of understanding" concerning the agreement they had reached. *See id.* The record does not reflect any other terms of the verbal agreement or state which parties were contributing to the payments. There are also inconsistent statements regarding whether the payments were loans or advance settlement payments. Mr. Nicoll states that Mr. Rasmussen "offered to advance funds to Giroux in what he called a humanitarian gesture provided that . . . Kangamiut could have a credit against a future judgment or settlement." Nicoll Decl. (Dkt. # 96) ¶ 3.

Early the following morning, Mr. Nicoll emailed Mr. Giroux and stated that he would go over the agreement "one more time with Niels and Lars" and would send Mr. Giroux an agreement for review and signature later that morning. *See* Giroux Decl. Exh. F (Dkt. # 93-2). Mr. Nicoll later emailed with news that the written agreement was not yet finalized, but told Mr. Giroux, "don't worry, the agreement reached verbally yesterday will be honored, we just have to get a little more input on the details of the wording." *Id.* In that email, Mr. Nicoll also promised to get a draft to Mr. Giroux for signature early the next week. *Id.*

Several delays occurred over the following weeks. Emails from Mr. Rasmussen and Ms. Mortensen to Mr. Giroux in November and December gave various reasons for

ORDER – 4

the delays. *See, e.g.*, Giroux Decl. Exh. G (Dkt. # 93-2). One of these emails noted that despite the delay in obtaining a written agreement, "payments [had] already been issued" to Mr. Giroux. *Id.* In January 2009, Ms. Mortensen informed Mr. Giroux that "we have not been able to reach a final agreement between the 3 parties expected to participate in this 'package.'" Giroux Decl. Exh. H (Dkt. # 93-2). Ms. Mortensen wrote that one party had not accepted the agreement, and that "[w]e, the remaining 2 parties, will of course fulfill our part of the agreement, but this means we can only offer you 15 months of payment in the amount USD 10,000." *Id.*

Mr. Espersen sent a written agreement to Mr. Giroux on February 5, 2009. *See* Nicoll Decl. Exh. 2 (Dkt. # 96). Mr. Nicoll reviewed the agreement at Mr. Giroux' request and advised him that "it looks fine" and "is basically as I initially envisioned it except for the length of time it is covering." *Id.* The final agreement obligates Kangamiut to pay "additional Settlement Advances" to Mr. Giroux in the amount of $10,000 per month for fifteen months, plus $50,000 in a lump sum to assist Mr. Giroux with his legal fees. *See* Nicoll Decl. Exh. 1 (Dkt. # 96). There is no signed version of the agreement in the record, but it appears to be undisputed that Mr. Giroux signed it. Mr. Giroux received fifteen monthly payments of $10,000 each; the last payment arrived in January 2010. *See* Pltf.'s Opp'n (Dkt. # 92) at 7; Giroux Decl. (Dkt. # 26) ¶ 8 (acknowledging that Mr. Giroux received $150,000 rather than the $240,000 he was promised). All payments Mr. Giroux received came from Kangamiut. *See* Pltf.'s Opp'n at 7 n.6.

Mr. Giroux claims that Keyport's actions made it a party to the verbal agreement and that Keyport breached that agreement, resulting in a lesser number of payments than Mr. Giroux expected. Through his claim for breach of contract, he seeks relief against Keyport.

The court now turns to Keyport's motion for summary judgment.

ORDER – 5

## III. ANALYSIS

On a motion for summary judgment, the court cannot resolve factual disputes, but must instead draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in answering legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

**A.  Mr. Giroux Has Not Presented Evidence for a Jury to Conclude that Keyport Was a Party to the November 2008 Verbal Agreement.**

**1. Florida Contract Law Applies.**

Both parties rely on Florida contract law. Under Florida law, a breach of contract claimant must prove the existence of a valid contract. *See Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. App. 2006) (citations omitted) (listing the elements of a breach of contract claim). A claimant must "prove by a preponderance of the evidence" that such a contract exists. *Knowles v. C. I. T. Corp.*, 346 So.2d 1042, 1043 (Fla. App. 1977). A valid contract "arises when the parties' assent is manifested through written or spoken words, or 'inferred in whole or in part from the parties' conduct.'" *Baron v. Osman*, No. 5D09-1781, 2010 WL 2628655, at *1 (Fla. App. Jul. 2, 2010) (citing *Commerce P'ship v. Equity Contracting Co.*, 695 So.2d 383, 385 (Fla. App. 1997)). To state a claim for breach of an *oral* contract, "a plaintiff is required to allege facts that, if taken as true, demonstrate that the parties mutually assented to 'a certain and definite proposition' and

ORDER – 6

left no essential terms open." *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So.2d 297, 300 (Fla. App. 1999) (citing *Jacksonville Port Auth. v. W.R. Johnson Enter., Inc.*, 624 So.2d 313 (Fla. App. 1993)); *see also Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co.*, 773 So.2d 96, 97 (Fla. App. 2000) ("Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms."). "Competent substantial evidence" must support a finding of mutual agreement. *Long Term Mgmt., Inc. v. Univ. Nursing Care Center, Inc.*, 704 So.2d 669, 673 (Fla. App. 1997).

What constitutes an essential term of a contract "will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So.2d 1053, 1056 (Fla. App. 2007) (citing *King v. Bray*, 867 So.2d 1224, 1228 (Fla. App. 2004)). For example, failure to "sufficiently determine quality, quantity, or price may preclude the finding of an enforceable agreement." *Jacksonville Port Auth.*, 624 So.2d at 615.

Mr. Giroux claims that "although it was never made explicit at the time of the meeting, [he] always supposed that all three original defendants would be contributing to the advance payments, including and especially Keyport, as Keyport's attorney drafted the agreement and played such a central role at the Jacksonville meeting." Giroux Decl. (Dkt. # 93) ¶ 26. The court will consider Keyport's involvement in the verbal agreement by examining three chronological segments: prior to the November meeting, during the meeting itself, and after the meeting (both immediately after and several months later).

### 2. Evidence Prior to the Verbal Agreement Does Not Support Mr. Giroux' Contention that Keyport was a Party.

Prior to the November 2008 meeting, Mr. Nicoll (on behalf of Keyport) expressly denied any involvement other than a role as a mediator. Keyport became involved with the meeting planning only after Mr. Giroux and Kangamiut had already discussed their intention to meet. Even then, Keyport refused to participate unless Mr. Giroux

ORDER – 7

acknowledged his understanding of Keyport's role in the process. Mr. Nicoll drafted two documents requiring that Mr. Giroux agree not to sue Keyport and clarifying that Mr. Nicoll's role in the negotiations was solely to mediate between Mr. Giroux and Kangamiut. *See* Pedersen Decl. Exh. 1 (Dkt # 91-2) (containing the Hold Harmless Agreement and the disclosure letter). Mr. Giroux signed both documents, acknowledging that Keyport's representatives would travel to Jacksonville "to help negotiate to a compromise" his claims against Kangamiut and that Mr. Nicoll's specific role would be "to help mediate a compromise." *See id.* Mr. Giroux has presented no evidence showing that Keyport's behavior prior to the verbal agreement evidenced intent to be bound as a party.

### 3. Mr. Giroux Has Not Shown by a Preponderance of the Evidence That Keyport's Behavior During the November Meeting Made It a Party to the Verbal Agreement.

At the November meeting, Keyport's representatives met with Mr. Giroux and Kangamiut and helped the latter two parties arrive at the verbal agreement. Mr. Giroux claims that Keyport's involvement in the meeting is enough to bind Keyport as a party. However, he presents no credible evidence to this effect, and his mere supposition "that all three original defendants would be contributing to the advance payments" is not evidence of the existence of a contract. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (noting that "mere allegation and speculation do not create a factual dispute for purposes of summary judgment"). The evidence supports Mr. Nicoll's contention that Keyport played a mediating role at the November meeting. For example, Mr. Nicoll states that he "met with all parties and separately with the two groups several times" during the meeting. Nicoll Decl. (Dkt. # 96) ¶ 3. He further states that Mr. Rasmussen formulated the agreement and made the offer to Mr. Giroux; Mr. Nicoll's role was simply to draft a written agreement based on the terms to which Mr. Giroux and Kangamiut agreed. *See id.* Aside from his suppositions, Mr. Giroux does not present evidence to the contrary. Thus, Mr. Giroux has not presented evidence sufficient for a

ORDER – 8

jury to conclude that Keyport served a role other than mediator during the November meeting.

### 4. Mr. Giroux Has Not Presented Evidence to Conclude That Keyport's Behavior After the November Meeting Made It A Party to the Verbal Agreement.

After the November meeting, Mr. Giroux, Kangamiut, and Keyport's representatives communicated several times by email. Mr. Giroux' strongest argument pertains to the emails Mr. Nicoll sent immediately after the meeting concerning the drafting of the agreement. In particular, Mr. Giroux points to the email he received from Mr. Nicoll on November 7, 2008, the day after the Florida meeting. In that email, Mr. Nicoll told Mr. Giroux not to worry and that "the agreement reached yesterday will be honored . . . . [w]e have a good working draft and will have something for you to review and sign very early next week." *See* Giroux Decl. Exh. F (Dkt. # 93-2) at 30. Mr. Giroux construes Mr. Nicoll's statement as proof that Keyport was a party to the agreement reached at the Florida meeting. However, that statement does not exist in a vacuum; it must be considered in the context of all other evidence submitted by the parties. Based on the rest of the evidence concerning Keyport's involvement, no reasonable jury could conclude that Keyport was a party to the verbal agreement.

In the weeks following the Florida meeting, more emails were exchanged between the parties concerning the delay in securing a written agreement. When Mr. Giroux received emails from Kangamiut that mentioned difficulties in coming to an agreement with an unnamed party, Mr. Giroux assumed that party was Keyport. *See* Giroux Decl. (Dkt. # 93) ¶ 28. Mr. Giroux offers only his speculation that the breaching party was Keyport, which is insufficient to establish that Keyport was a party to the verbal agreement. Kangamiut wired all of the funds to Mr. Giroux; there is no evidence that Keyport ever contributed to the payments. In fact, from the time of the November meeting up until Mr. Giroux received a written contract from Kangamiut in February 2009, there is no evidence showing which parties were obligated to contribute, other than

ORDER – 9

Kangamiut. Kangamuit's representatives sent emails to Mr. Giroux mentioning "3 parties" and "the remaining 2 parties," but the emails do not specify those parties' identities. *See* Giroux Decl. Exh. H (Dkt. # 93-2). Furthermore, only Kangamiut and Mr. Giroux were parties to the written agreement. Thus, Mr. Giroux has not shown by "competent substantial evidence" that a meeting of the minds occurred between him and Keyport concerning the monthly payments. *See Long Term Mgmt., Inc*, 704 So.2d at 673.

Mr. Giroux presents no evidence showing that he and Keyport mutually agreed to a certain and definite proposition. Under the Hold Harmless Agreement, Keyport had agreed to help Mr. Giroux negotiate a compromise with Kangamiut. However, the record contains no evidence to suggest that Keyport agreed to contribute to the 24 payments Mr. Giroux claims he is entitled to receive. Even if the verbal agreement was an enforceable contract, there is no evidence from which a jury could conclude that Keyport was a party to it.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS Keyport's motion for summary judgment (Dkt. # 90) on Mr. Giroux' breach of contract claim.

DATED this 12th day of August, 2010.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 10